**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| PAULINE VALENTI, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 15-CV-1281 (JCH) |
| v. | : | |
| | : | |
| SLEEPMED, INC., | : | JULY 10, 2017 |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 24)**
**AND MOTION FOR SANCTIONS PURSUANT TO RULE 11 (DOC. NO. 29)**

## I.    INTRODUCTION

Plaintiff, Pauline Valenti ("Valenti"), brought this action against defendant,

SleepMed, Inc. ("SleepMed").  Compl. (Doc. No. 1).  Valenti alleges that SleepMed

failed to accommodate her disability, discriminated against her, and retaliated against

her by terminating her employment in violation of the American with Disabilities Act

Amendments Act of 2008 ("ADA").  Id. at 5-9; see 42 U.S.C. §12101 et seq.  Valenti

also alleged that that SleepMed interfered with her rights under the Family and Medical

Leave Act ("FMLA") of 1993, but in her Memorandum of Law in Support of Plaintiff's

Objection to Defendant's Motion for Summary Judgment, she withdraws Counts Four

and Five related to the FMLA, which the court so orders.  Mem. of Law in Support of

Pl.'s Objection to Def.'s Mot. for Summ. J. ("Pl.'s MFSJ Obj.") (Doc. No. 39-3) at 1.

SleepMed answered Valenti's Complaint, denied the allegations, and presented various

affirmative defenses.  Answer (Doc. No. 9).

Currently pending before the court are SleepMed's Motion for Summary

Judgment and Motion for Sanction pursuant to Rule 11.  See Def.'s Mot. for Summ. J.

("MFSJ") (Doc. No. 24); Def.'s Mot. for Sanctions Pursuant to R. 11 ("Mot. for Sanctions") (Doc. No. 29).  Valenti objected to both Motions.  <u>See</u> Pl.'s Obj. to Def.'s Mot. for Summ. J.; Pl.'s Obj. to Def.'s R. 11 Mot. for Sanctions ("Pl.'s Sanctions Obj.") (Doc. No. 34).  SleepMed timely replied.  <u>See</u> Def.'s Br. in Reply to Pl.'s Obj. to Def.'s Mot. for Summ. J. ("Def.'s MFSJ Reply") (Doc No. 47); Def.'s Reply to Pl.'s Mem. of Law in Support of Pl.'s Obj. to Def.'s R. 11 Mot. for Sanctions ("Def.'s Sanctions Reply") (Doc. No. 38).

After careful review of the submissions of the parties, and for the reasons that follow, the Motion for Summary Judgment (Doc. No. 24) is **DENIED**, and the Motion for Sanctions Pursuant to Rule 11 (Doc. No. 29) is **DENIED**.

## II.    FACTS[1]

Valenti suffers from difficulties with her knees which stem from an injury she sustained in March of 2007.  <u>See</u> Local Rule 56(a)1 Statement of Undisputed Material Facts ("L.R. 56(a)1 Stmt.") (Doc. No. 24-7) at ¶¶ 1-2.  Four years later, in March of 2011, she completed an application for employment as a polysomnographer with SleepMed, in which she acknowledged that she would be able to perform, without any accommodation, the duties, tasks, and functions of the position for which she was applying.  <u>See</u> L.R. 56(a)1 Stmt. at ¶ 6.  She was offered the position of Sleep Technologist II ("Sleep Tech") in April 2011, with a start date of April 26, 2011.  <u>See</u> <u>id.</u> at ¶ 7.  On April 9, 2011, she signed a job description for Sleep Tech indicating that she

---

[1] Unless otherwise noted, the parties have indicated that these facts are undisputed by statements in the Answer (Doc. No. 9) and their respective Local Rule 56(a) filings (Doc. Nos. 24-7 & 39-1).  Only those facts necessary to resolve the pending Motion are discussed herein. Additional facts, including those facts the parties dispute, are discussed as necessary in the analytical section of this Ruling. <u>See</u> <u>infra</u> at 8-29.

had read, understood, and agreed to comply with the Sleep Tech job description.  See id. at ¶ 8.  This form included a physical requirements section that stated that the Sleep Tech "[m]ust be able to lift/move up to 50 pounds and be able to walk, push, pull, grasp, bend, stoop, squat and reach as necessary."  See Pl.'s Local Rule 56(a)(2) Statement ("Pl.'s L.R. 56(a)(2) Stmt.") (Doc. No. 39-1) at ¶ 15; L.R. 56(a)1 Stmt. at ¶ 15.  One of the "essential duties" described in the Sleep Tech job description which Valenti signed was the duty to "[g]reet patient[s] upon arrival and escort him/her to sleep room."  See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 12; L.R. 56(a)1 Stmt. at ¶ 12.

Valenti primarily worked at the Wallingford Courtyard Marriott sleep lab, but would work at the Farmington lab on occasion.  See L.R. 56(a)1 Stmt. at ¶  9.  When she was scheduled to work her shift at the Wallingford location, she would be the only SleepMed employee present.  See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 11.  At the Wallingford sleep lab, SleepMed expected the Sleep Tech on duty to greet patients in the hotel lobby and escort the patients up to the sleep lab via an elevator, as well as escort the patients from the sleep lab back to the lobby in the morning.  See Id. at ¶ 13; L.R. 56(a)1 Stmt. at ¶ 13.   In 2012, Valenti made a request to her direct clinical supervisor, Ainsley Palmisano ("Palmisano"), that Valenti be excused from escorting patients to and from the hotel lobby, which was the only accommodation she ever requested.  See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 16; L.R. 56(a)1 Stmt. at ¶ 16.  SleepMed ultimately permitted Valenti to forgo escorting patients from the hotel lobby, though there is a dispute as to whether this was intended to be a temporary accommodation or a permanent one.  See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 19 (generally denying the facts stated in L.R. 56(a)1 Stmt. at ¶ 19, but substantively only disputing the description of the accommodation as

temporary); L.R. 56(a)1 Stmt. at ¶ 19.  She continued not escorting patients to and from the hotel lobby at least until August 2014.  See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 21; L.R. 56(a)1 Stmt. at ¶ 21.

In or around August 2014, SleepMed received complaints about Valenti from patients.  See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 20; L.R. 56(a)1 Stmt. at ¶ 20.  On August 11, 2014, Lynn Hallinan ("Hallinan"), the Clinical District Operations Manager, contacted Valenti via email requesting a doctor's note describing her limitations.  See L.R. 56(a)1 Stmt. at ¶ 18, 24.  Specifically, she stated that she was under the impression that Valenti had only requested to be relieved from greeting patients in the lobby on a temporary basis, and that greeting patients in the lobby was part of her job, so if Valenti could not do it, Hallinan would need a physician's note describing Valenti's limitations. See id. at ¶ 24.  On August 16, 2014, Valenti provided Hallinan and Nancy Foote, SleepMed's Compliance Officer, with a doctor's note from Dr. Russell Chiappetta, Valenti's orthopedic doctor, which stated that Valenti was restricted from "excessive standing or walking."  See id. at ¶ 26.  SleepMed responded by requesting additional information regarding her limitations from Valenti.  See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 28; L.R. 56(a)1 Stmt. at ¶ 28.  Valenti responded that she was not required to provide any further information.  See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 29; L.R. 56(a)1 Stmt. at ¶ 29.

On August 27, 2014 Joseph Rose ("Rose"), SleepMed's Vice President of Finance and Administration reached out to Valenti to inform her that, at the hotel-based sleep labs in Connecticut, "it is important for all our overnight sleep techs to meet the sleep patients at the front desk and escort them to and from the front desk."  See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 30; L.R. 56(a)1 Stmt. at ¶ 30.  He reiterated that Hallinan

believed Valenti's condition was temporary and had been unaware that Valenti was still using the accommodation. See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 31; L.R. 56(a)1 Stmt. at ¶ 31. Rose's email also contained the job description for a Sleep Tech and SleepMed's ADA medical questionnaire ("ADA Form"), and he asked Valenti to provide both to her doctor, who should complete and return the ADA form directly to Diane Rule ("Rule"), SleepMed's Benefit and Payroll Manager, by September 4, 2014. See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 32; L.R. 56(a)1 Stmt. at ¶ 32.

Starting in or around the beginning to the middle of September 2014, Valenti was out of work on medical leave for issues unrelated to her alleged disability. See L.R. 56(a)1 Stmt. at ¶ 34. On September 9, 2014, Rose emailed Valenti again, informing her that SleepMed had not received the completed ADA Form and explained that, if Valenti would like to remain on the work schedule, SleepMed needed the completed ADA Form. See id. at ¶ 33. Rose sent another follow up to Valenti on October 3, 2014, explaining that the ADA Form was necessary to properly assess Valenti's medical conditions and determine what accommodations she might need. See id. at ¶ 36. Valenti responded with her opinion that she had already provided SleepMed with the information they needed, and stated her belief that she was being treated unfairly. See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 37; L.R. 56(a)1 Stmt. at ¶ 37. Meanwhile, on October 1, 2014, Valenti signed an Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination against SleepMed based on disability discrimination. See L.R. 56(a)1 Stmt. at ¶ 35.

At some time, Valenti gave the ADA Form to her doctor. See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 38; L.R. 56(a)1 Stmt. at ¶ 38. The parties disagree about how much of the

form was filled out, and how it was sent to SleepMed, but by November 28, 2014, SleepMed received a version of the ADA Form with pages one, two, and four filled out, and page three with a strike through. See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 39-45; L.R. 56(a)1 Stmt. at ¶ 39-45. It was Valenti's position that, because question five on page three of the ADA Form was answered "no" and the ADA Form stated that, if the answer to question five was "no" the remainder of the ADA Form did not need to be completed, her doctor did not need to complete page three of the ADA Form. See L.R. 56(a)1 Stmt. at ¶ 46. It was also clear that, despite question five being marked no, Valenti's doctor had clearly continued to answer question six on the bottom of page two. See id.

On December 1, 2014, SleepMed terminated Valenti. See Pl.'s L.R. 56(a)(2) Stmt. at ¶ 48; L.R. 56(a)1 Stmt. at ¶ 48.

## III.    STANDARD OF REVIEW

The party moving for summary judgment "bears the burden of establishing the absence of any genuine issue of material fact." Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010). Once the moving party has satisfied that burden, to defeat the motion "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "For summary judgment purposes, a 'genuine issue' exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor." Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co., 421 F. App'x 52, 53 (2d Cir.2011); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, (1986)) (stating that the non-moving party must demonstrate more than a mere "scintilla" of evidence in its favor).

"[U]nsupported allegations do not create a material issue of fact." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). The role of the district court in deciding a summary judgment motion "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact." O'Hara v. Nat. Union Fire Ins. Co. of Pittsburgh, 642 F.3d 110, 116 (2d Cir. 2011). In making this determination, the court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013).

Rule 11 provides, in relevant part, that an attorney who presents a pleading to the court certifies that to the best of the person's knowledge, formed after a reasonable inquiry, "the factual contentions have evidentiary support or, if so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). If the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on the party that violated the rule. Fed. R. Civ. P. 11(c)(1).

## IV. DISCUSSION

### A. Motion for Summary Judgment

SleepMed argues that it is entitled to judgment as a matter of law on each of the counts set forth in Valenti's Complaint. The court will consider each of SleepMed's arguments in turn.

#### 1. Counts One: Disability Discrimination

The first count of Valenti's Complaint alleges that SleepMed violated the ADA by discriminating against her on the basis of her disability. See Compl. at 5-6. SleepMed argues that it is entitled to summary judgment on Count One because (1) Valenti was

not qualified to perform the essential functions of her job, with or without a reasonable accommodation; (2) Valenti did not suffer an adverse employment action because of her disability; and (3) Valenti cannot prove that SleepMed's reasons for its actions were discriminatory.  See Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s MFSJ Br.") (Doc. No. 24-1) at 10-16. For the reasons that follow, the court concludes that there are genuine issues of material fact relevant to the resolution of each of the points raised by SleepMed.  Thus, SleepMed's Motion for Summary Judgment is denied as to Count One.

In the context of a motion for summary judgment, federal claims that an employee has been discriminated against due to a disability are analyzed under the McDonnell Douglas Corp. v. Green framework.  411 U.S. 792, 802, 804 (1973); see McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013).  First, "[a] plaintiff must establish a prima facie case; [then] the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 169 (2d Cir. 2006).  A plaintiff can show the prima facie case of discriminatory discharge under the ADA by demonstrating, by a preponderance of the evidence, that: "(1) [her] employer is subject to the ADA; (2) [she] was disable within the meaning of the ADA; (3) [she] was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [she] suffered adverse employment action because of [her] disability."  McMillan, 711 F.3d at 125 (quoting Sista, 445 F.3d at 169).

SleepMed does not contest the first two elements of the prima facie case, but does argue that there is no genuine issue of material fact with regard to the third and fourth elements. See Def.'s MFSJ Br. at 10-15. The court considers each of SleepMed's arguments in turn.

a. Essential Functions

SleepMed first argues that it is entitled to summary judgment on Valenti's claim of discriminatory discharge because she was unqualified to perform the essential functions of being a Sleep Tech, with or without accommodation, because she could not escort patients nor meet the physical lifting requirements of the position. See id. at 11-13. Valenti responds that the essential function of the Sleep Tech position is to "perform comprehensive polysomnographic testing, analysis, and associated intervention." See Pl.'s MFSJ Obj. at 11. This is a function she is qualified for and therefore, she argues, she can perform the essential functions of the role. See id. at 11-12. She also argues that she was still able to greet and escort patients as required in the job description, she just did so from the elevators instead of the hotel lobby. See id. at 12-13. Valenti does not argue that she could greet and escort patients from the lobby. See id. Thus, the question for the court is whether there is a genuine issue of material fact as to the essential functions of a Sleep Tech.

The term "essential functions" is not clearly defined in the ADA, which only contains guidance that consideration must be "given to the employer's judgment as to what functions of a job are essential," and the written description of the job provided in advertising and interviewing applicants. See 42 U.S.C. § 12111(8). The court must give substantial deference to the opinion of the employer with regards to whether a function is essential. McBride v. BIC Consumer Prods. Mfg. Co., Inc., 583 F.3d 92, 98 (2d Cir.

2009).  The Second Circuit has also directed courts to review the regulations promulgated by the EEOC to further illuminate what constitutes an "essential function." Id. at 98; see 29 C.F.R. § 1630.2(n)(1) (2012) ("The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires.  The term 'essential functions' does not include the marginal functions of the position.").

The EEOC regulations explain that a job function may be considered "essential" for any of the following non-exhaustive reasons: (1) "the reason the position exists is to perform that function;" (2) there is a "limited number of employees available among whom the performance of that job function can be distributed; and/or" (3) the job function is so highly specialized "that the incumbent in the position is hired for his or her expertise or ability to perform the particular function."  29 C.F.R. § 1630.2(n)(2).  The regulations further indicate that the following evidence is relevant to the determination of whether a job function is essential:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;[2]
>
> (vi) The work experience of past incumbents in the job; and/or

---

[2] There is no evidence of a collective bargaining agreement before the court, and so the court will not address the fifth factor.  See Def.'s MFSJ Reply at 6.

> (vii) The current work experience of incumbents in similar jobs.

Id. at (n)(3). The ultimate determination of whether a specific function is an essential one "depends on the totality of the circumstances." Rodal v. Anesthesia Grp of Onondaga, P.C., 369 F.3d 113, 120 (2d Cir. 2004). After a careful evaluation of the evidence and the factors the court is to consider, the court finds that there is a genuine issue of fact as to whether escorting the patients from the hotel lobby is an essential function of the position of Sleep Tech.

Many of the factors do support SleepMed's contention that escorting patients to and from the hotel lobby is an essential function of a Sleep Tech. For example, the second listed method by which a function could be determined to be essential is whether there was a limited number of employees available among whom the function could be distributed. 29 C.F.R. § 1630.2(n)(2)(ii). Valenti worked the overnight shift at the Wallingford sleep lab and was the only SleepMed employee present during her shift. L.R. 56(a)1 Stmt. at ¶ 11. Thus, there were no other employees who could perform the function of bringing patients from the lobby to the sleep lab during Valenti's shift.

Similarly, there is evidence that supports SleepMed's argument that escorting patients was an essential function of Sleep Techs. The first listed factor in the regulations—and indeed the most obvious factor in support of SleepMed's argument—is the evidence that SleepMed considered escorting patients to and from the hotel lobby to be an essential function. See Dep. of Rose at 16:2-7 (Doc. No. 24-11) ("Well, escorting patients, particularly at that lab, was an essential function of Ms. Valenti's job."); 29 C.F.R. §1630.2(n)(3)(i). Additionally, some of the written descriptions of the Sleep Tech position do include greeting and escorting patients as an "essential duty." Indeed the job

description which Valenti signed does include a section entitled "essential duties", which at section B.3 states that one of the duties is to "[g]reet patient upon arrival and escort him/her to sleep room." Ex. 13 to Dep. of Pauline Valenti (Doc. No. 24-9 at 5-6). This too is evidence in support of SleepMed's position. 29 C.F.R. § 1630.2(n)(3)(ii).

The current work experience of incumbents in similar jobs also appears to favor SleepMed's position. See 29 C.F.R. §1630.2(n)(3)(vii). The evidence before the court indicates that SleepMed's policy of requiring Sleep Techs to escort patients from the hotel lobby was also in place at SleepMed's other hotel-based lab. See Def.'s MFSJ Reply at 8; Dep. of Palmisano (Doc. No. 47-8) at 28.

The court's role, however, is not to determine whether there is evidence to support SleepMed's position, but rather to determine if, based on the facts before it, any reasonable jury could decide in favor of the plaintiffs. See Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) ("In weighing the evidence on a motion for summary judgment, the 'judge must ask . . . not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence present.'") (citing Anderson v. Liberty lobby, Inc., 447 U.S. 242, 252 (1986)). Valenti directs the court to the other factors listed in section 1630.2(n)(2), as well as other evidence described in (n)(3), such that the court cannot, looking to a totality of the circumstances, conclude that no reasonable jury could decide in her favor. See Rodal, 369 F.3d at 120.

First, the two other factors listed in (n)(2) suggest that escorting patients was not an essential function of the Sleep Tech position. SleepMed does not argue that the reason for the existence of the Sleep Tech position is to greet and escort patients, nor

does it argue that escorting patients is highly specialized and requires special expertise. Cf. Def.'s MFSJ Reply at 6 (explaining that factor two supports a finding that escorting patients was an essential function, but without addressing Valenti's arguments as to factor one or three because SleepMed contends the finding that any of the factors applies is sufficient to demonstrate that a function is essential). The court acknowledges SleepMed's argument that factor two supports a finding that the task was essential; however, looking to the totality of the circumstances, section 1630.2(n)(2)(ii) cannot alone control whether the function was essential—in this case that would render every single function of the Sleep Tech position as essential because Valenti worked the night shift alone. Were the court to adopt SleepMed's understanding of subsection (n)(2), it would, in essence, be ignoring the general definition provided in section 1630.2(n)(1), which states that "the term 'essential functions' does not include the marginal functions of the position. 29 C.F.R. § 1630.2(n)(1). Instead, the court looks to subsection (n)(3), where it finds further evidence that would enable a reasonable jury to find in favor of Valenti.

For example, the written description which SleepMed cites to show that greeting and escorting patients is an essential function does not specify where the patients are to be met. See Ex. 13 to Dep. of Pauline Valenti (Doc. No. 24-9 at 5-6). Valenti argues that she did greet and escort patients, just from the elevator lobby. See Pl.'s MFSJ Obj. at 12; Dep. of Valenti (Doc. No. 39-4) at 312. Thus, it could be said that Valenti was, in fact, performing the function as described in the written materials. Valenti also directs the court to other job postings for the Sleep Tech position which do not include a reference to the escorting and greeting requirement. See Pl.'s Ex. 17 (Doc. No. 39-18);

See 29 C.F.R. § 1630.2(n)(3)(ii).  Additionally, the time spent greeting and escorting patients occupied only a small fraction of the overall Sleep Tech shift—roughly five to ten minutes out of a ten and a half hour shift.  See Dep. of Hallinan (Doc. No. 39-6) at 22.  This too supports Valenti's claim that escorting and greeting patients was not an essential function.  See 29 C.F.R. § 1630.2(n)(3)(iii).

There is also evidence that is less conclusive, and further bolsters the court's view that the issue of whether escorting and greeting patients is an essential function is a question best left to a jury.  For example, what the consequences of Valenti not greeting and escorting patients were cannot be easily determined.  On the one hand, Rose testified that he believed that Sleep Techs needed to escort patients at least in part to help avoid falls.  See Def.'s MFSJ Reply at 8; Dep. of Rose (Doc. No. 24-11) at 21.  On the other hand, there is evidence that Valenti did not escort patients from the lobby for approximately two years without incident or complaint regarding the lack of lobby greeting.  See L.R. 56(a)1 Stmt. at ¶ 16, 20-21; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 16, 20-21; cf. Dep. of Palmisano (Doc. No. 39-7) at 43 (describing complaints received about Valenti, but only regarding the temperature in the sleep lab).  The court cannot conclude that the evidence regarding the consequences of Valenti's refusal to greet and escort patients from the lobby supports either party—indeed this is precisely the type of genuine issue that is best left to the sound judgment of a jury.

Finally, the court does not have evidence before it of what prior Sleep Techs at the Wallingford sleep lab were asked to do, and so cannot evaluate the evidence of the sixth type of evidence listed in the EEOC regulations.  See 29 C.F.R. § 1630.2(n)(3)(vi).

Thus, the totality of the circumstances indicate that there remains a genuine issue of material fact as to whether escorting and greeting patients from the lobby of the hotel is an essential function. Rodal, 369 F.3d at 120. A reasonable jury could find, based on the evidence before the court, that escorting and greeting patients from the hotel lobby was a marginal function and that Valenti could perform the essential functions of her position with the accommodation she had been using from 2012 until 2014 of greeting patients at the elevator. See 29 C.F.R. § 1630.2(n)(1). The court will not grant SleepMed's Motion for Summary Judgment on the theory that escorting and greeting patients was an essential function of Valenti's position that she could not perform with or without an accommodation. See Def.'s MFSJ Br. at 11-13.

SleepMed also mentions that there is a physical lifting requirement that Valenti could not meet and that is an essential function of the Sleep Tech position. See Def.'s MFSJ Br. at 11. SleepMed's brief points only to the fact that the job description includes the requirement that Sleep Techs "be able to lift/move up to 50 pounds." See id. at 13; Ex. 13 to Dep. of Pauline Valenti (Doc. No. 24-9 at 5-6) (containing the weight lifting requirement). This single piece of evidence is only probative of only one of the factors, and alone is insufficient to establish that there is no genuine issue of fact regarding whether the weight lifting requirement was an essential function of the Sleep Tech position. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.").

b.   <u>Adverse Employment Action Because of Disability</u>

SleepMed next argues that Valenti cannot show the fourth element of the prima facie case, namely that she suffered an adverse employment action because of her disability. <u>See</u> Def.'s MFSJ Br. at 13-16. Under this element, "a plaintiff must show that the adverse employment action took place under circumstances giving rise to an inference of discrimination." <u>Flieger v. Eastern Suffolk BOCES</u>, No. 16-2556-cv, 2017 WL 2377853, at *1 (2d Cir. June 1, 2017) (quoting <u>Davis v. New York City Dep't of Educ.</u>, 804 F.3d 231, 235 (2d Cir. 2015)). Establishing the prima facie case "is not a demanding burden." <u>Greenway v. Buffalo Hilton Hotel</u>, 143 F.3d 47, 52 (2d Cir. 1998). Under <u>McDonnell Douglas</u>, the plaintiff must only set forth facts sufficient to give rise to the inference of discrimination, which shifts the burden to the defendant to demonstrate that there was a legitimate, non-discriminatory reason for its action. <u>Id.</u>

SleepMed argues that it did not terminate Valenti because she was disabled, but rather because she either was unable to, or refused to, greet and escort patients and also refused to engage in an interactive dialogue to determine what could be done to accommodate her disability. Def.'s MFSJ Br. at 13-15. Upon review of the record, however, the court finds that there is evidence which, when viewed in the light most favorable to Valenti, could lead a reasonable jury to infer that SleepMed discriminated against Valenti due to her disability.

The record before the court illustrates a drawn-out dispute between Valenti and her employer regarding her avoidance of a specific task due to the pain it caused her due to her disability, and what information SleepMed needed to determine if she was fit

for the position.  See, e.g., Ex. 6 to Pl.'s MFSJ Obj. (Doc. No. 39-9) (containing an email from Valenti to Hallinan on August 16, 2014, that Valenti was providing a doctor's note regarding her disability); Ex. 8 to Pl.'s MFSJ Obj. (Doc. No. 39-12) (containing a forwarded email from Valenti to Hallinan on August 22, 2014, wherein Valenti stated she felt discriminated against because she was being singled out after using her accommodation for two years); Ex. 58 to Dep. of Valenti (Doc. No. 24-9 at 34-35) (including an email exchange between Valenti and Rule on December 1, 2014, wherein Valenti indicates she does not believe that question seven on the ADA Form needs to be filled out, and in response Rule terminates Valenti's employment).  Taken together, and read in the light most favorable to the non-movant, these facts could plausibly give rise to the inference that Valenti was fired due to her disability, and thereby demonstrate that there is a genuine dispute as to the fourth element of the prima facie case.  See Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013) ("In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party.").

SleepMed's arguments are better characterized as responsive to the second step of the McDonnell Douglas framework, and thereby collapse with SleepMed's third argument.  The court will proceed to determine whether SleepMed can establish legitimate, non-discriminatory reasons for Valenti's termination.  See Def.'s MFSJ Br. at 16.

### c.    Legitimate, Non-Discriminatory Reasons

After the plaintiff establishes the prima facie case of discrimination, the burden shifts to the defendant-employer to offer legitimate, non-discriminatory reasons for its employment decision.  McBride v. BIC Consumer Prods. Mfg. Co., Inc., 583 F.3d 92, 96

(2d Cir. 2009).  Before the court can reach SleepMed's offered reasons, however, it must first address Valenti's argument that <u>McDonnell Douglas</u> should not apply because it is undisputed that Valenti was terminated due to her discrimination.  <u>See</u> Pl.'s MFSJ Obj. at 17 (citing <u>McMillan v. City of New York</u>, 711 F.3d 120, 129 (2d Cir. 2013)).  Valenti states that it is "undisputed" that she was not allowed to continue at SleepMed because of her disability, and therefore the court need not consider whether SleepMed's justification was pretextual.  <u>See</u> <u>id.</u>

Unsurprisingly, SleepMed disagrees with this characterization and argues instead that Valenti was fired because she was unwilling, or unable, to perform essential functions of the position, or because she would not engage in an interactive process to determine the extent of her disability.  <u>See</u> Def.'s MFSJ Reply at 8-9; Def.'s MFSJ Br. at 13-16.  Only one of these arguments stems directly from Valenti's disability—if she was terminated because she was physically unable to greet and escort patients from the hotel lobby, and she was physically unable to greet and escort patients from the hotel lobby because she was disabled, then there would be no need to evaluate whether SleepMed's reasons were pretextual.  <u>See</u> <u>McMillan</u>, 711 F.3d at 129 ("Here, it is undisputed that [the plaintiff] was tardy because of his disability and that he was disciplined because of his tardiness.  In other words, [the plaintiff] was disciplined because of his disability.").  SleepMed's other arguments, however, do not lead to the same inference.  If SleepMed can demonstrate that it terminated Valenti's employment because she was unresponsive to its inquiries regarding her disability or because she was simply unwilling to perform an allegedly essential function of her position, it would not have demonstrated that she was fired due to her disability, but instead due to an

intractable breakdown in the relationship between employer and employee regarding the latter's duties. Thus, the court must consider whether SleepMed can carry the shifted burden of showing a legitimate, non-discriminatory justification for its action, because it offers two theories that do not stem directly from her disability. See McBride, 583 F.3d at 96.

In arguing that Valenti was simply unwilling to greet and escort patients from the hotel lobby, SleepMed assumes that greeting and escorting patients is an essential function, but as the court discussed above, the court does not agree that it is beyond dispute that escorting and greeting is an essential function of the Sleep Tech position. See supra section IV.A.1.a. Thus, the court cannot agree that it is beyond dispute that Valenti was fired because she refused to perform essential functions of her position, and no reasonable accommodation existed which would allow her to perform the essential function despite her disability. See Def.'s MFSJ Br. at 15.

SleepMed also alleges that it terminated Valenti for her failure to engage in an interactive process with them regarding her disability. Under the burden shifting framework, "[t]he defendant's burden also is light. The employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." Greenway, 14 F.3d at 52. SleepMed points to its month long exchange with Valenti, wherein she repeatedly told them she would not provide them with more information, and that she refused to meet with her supervisors face to face. See Exs. 23-25 to Dep. of Valenti (Doc. No. 24-9 at 9-11) (containing emails from Valenti wherein she explains that she prefer to talk to Hallinan via email after Hallinan repeatedly asked for a time to set up a meeting); Ex. 58

to Dep. of Valenti (Doc. No. 24-9) at 35 (containing an email from Valenti to Rule, wherein Valenti says that her doctor would not answer question seven and telling Rule to make an employment decision based on what they had before them). In light of the low burden of production on defendants, this evidence is sufficient for the court to conclude that SleepMed has at least one explanation for termination that is legitimate and non-discriminatory. This shifts the burden back to Valenti, who must "persuade the fact finder that the employer's proffered explanation is merely a pretext for its intentional discrimination." Greenway, 143 F.3d at 52.

d.    Pretext

Here, because Valenti can cite to "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by [the] defendant were false, and that more likely than not [discrimination] was the real reason for the [employment action]," the court denies SleepMed's Motion for Summary Judgment as to the disability discrimination claim. Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (internal citations omitted).

Valenti argues that she can establish that SleepMed's proffered explanation is pretext by showing that she actually did engage in the interactive process. See Pl.'s MFSJ Obj. at 17-23. Valenti provided SleepMed with a doctor's note explaining her limitations within five days of SleepMed's first request. See Pl.'s MFSJ Obj. at 18; Exs. 5-7 to Pl.'S MFSJ Obj. (Doc. Nos. 39-8, 39-9, 39-10). SleepMed then requested that Valenti's doctor fill out a more detailed ADA form. L.R. 56(a)1 Stmt. at ¶ 32. Although it is disputed how SleepMed ultimately received the three pages it did, it is undisputed that SleepMed did receive three completed pages of that form. See Dep. of Rose (Doc. No. 39-5) at 60. Valenti further argues that, because question five was marked no, and

the form clearly indicates that the rest of the form need not be filled out if question 5 is marked no, she did provide SleepMed with a "completed" form.  See Pl.'s MFSJ Obj. at 20-21.  SleepMed argues that, because Valenti was unwilling to acquiesce to their request for every page of the ADA Form filled out, she refused to participate in the interactive process.  However, Valenti has pointed to sufficient evidence that Valenti did engage in an interactive process by providing SleepMed with the information she did.  See Def.'s MFSJ Br. at 15; Pl.'s MFSJ Obj. at 22.  Valenti provided SleepMed with a form explaining what her disability was, which indicated that she needed to limit her walking to the non-essential job functions. See Ex. 12 to Pl.'s MFSJ Obj. (Doc. No. 39-15) at 2.  Indeed, the more fully completed form only reiterates this point, adding that Valenti should avoid prolong standing, stair climbing, stooping, and avoid carrying weight above 20-25 pounds.  See Def.'s Exhibit 12 (Doc. No. 27).  The court cannot conclude that there is no genuine issue as to whether Valenti engaged in the interactive process.

The evidence before the court indicate a disagreement between the parties regarding what information SleepMed required, and what it was entitled to.  Each side has evidence it can point to in support of its theory, and therefore this issue is not appropriate for the court to decide on summary judgment.  See Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995) ("On a summary judgment motion, the court is not to weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact.").  The court cannot find that there is no genuine issue of material fact as to whether escorting and greeting patients was an essential function of the Sleep Tech position and whether Valenti engaged in an interactive process to determine her level of

disability.  Therefore, SleepMed's Motion for Summary Judgment as to Count One, disability discrimination, is denied.

### 2. Count Two: Failure to Accommodate

The second count of Valenti's Complaint alleges that SleepMed violated the ADA by failing to accommodate her disability.  <u>See</u> Compl. at 7-8.  SleepMed argues that it is entitled to summary judgment on Count Two because (1) Valenti's proposed accommodation was unreasonable as a matter of law; and (2) Valenti refused to engage in the interactive process.  <u>See</u> Def.'s MFSJ Br. at 16-24. For the reasons that follow, the court concludes that there are genuine issues of material fact relevant to the resolution of each of the points raised by SleepMed.  Therefore, the court denies SleepMed's Motion for Summary Judgment as to Count Two.

A viable claim for failure to accommodate under the ADA requires the plaintiff to show that "(1) the plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, [the] plaintiff could perform the essential function of the job at issue; and (4) the employer has refused to make such accommodations." <u>McMillan</u>, 711 F.3d at 125.  SleepMed argues that Valenti cannot establish the third element, because Valenti's proposed accommodation was to not escort and greet patients, which SleepMed believes was an essential function of the Sleep Tech position, and therefore her proposed accommodation was unreasonable as a matter of law.  <u>See</u> Def.'s MFSJ Br. at 18; <u>Stevens v. Rite Aid Corp.</u>, 851 F.3d 224, 230 ("A reasonable accommodation can never involve the elimination of an essential function of a job.") (quoting <u>Shannon v. New York City Trans. Auth.</u>, 332 F.3d 95, 100 (2d Cir. 2003)).  This argument assumes that escorting and greeting patients was an essential function, which the court has

determined is a material fact in genuine dispute.  See supra at section IV.A.1.a.  Thus, the court cannot say that, as a matter of law, plaintiff's proposed accommodation was unreasonable.

Alternatively, SleepMed argues that Valenti refused to engage in the interactive process.  SleepMed argues that Valenti withheld the third page of the ADA Form in bad faith, and therefore she is to blame for the breakdown of the interactive process.  See Def.'s MFSJ Br. at 18-24; Young v. Cent. Square Cent. School Dist., 213 F. Supp. 2d 202, 214 (N.D.N.Y. 2002) ("If the interactive process breaks down, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary.") (internal citations omitted).  However, as noted above, there is evidence that supports the conclusion that Valenti did engage with SleepMed.  See supra at section IV.A.1.d.  Valenti also points to evidence that shows that it was SleepMed that was engaging in bad faith, as SleepMed had already determined that it would not allow her to continue greeting patients at the elevator bay, regardless of what her doctor said.  See Pl.'s MFSJ Obj. at 22; Dep. of Rose (Doc. No. 39-5) at 72-73 ("Q. So whether or not she was unwilling or unable doesn't really matter because either way that wasn't an accommodation that Sleepmed could provide? A. Correct.").  Drawing all inferences in Valenti's favor, this evidence is sufficient to create a "genuine issue for trial," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986), with respect to SleepMed's argument that Valenti failed to engage in the interactive process.

Thus, SleepMed's Motion for Summary Judgment as to Count Two, failure to accommodate, is denied.

3.    Count Three: Retaliation

The third count of Valenti's Complaint alleges that SleepMed retaliated against Valenti in violation of the ADA.  See Compl. at 8-9.  SleepMed contends that Valenti is incapable of establishing the prima facie case of retaliation.  See Def.'s MFSJ Br. at 24-28.  The prima facie case of discrimination is established when a plaintiff shows that: "(1) [she] engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [her]; and (4) a causal connection exists between the alleged action and the protected activity."  Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).  The plaintiff's burden to show the prima facie elements is de minimis.  Id.   As with claims for discrimination, "[c]laims for retaliation [under the ADA] are analyzed under the same burden-shifting framework established for Title VII cases."  Id.  SleepMed only disputes Valenti's ability to prove the fourth element, arguing that Valenti cannot establish any causal connection between any protected activity and any adverse employment action.  See Def.'s MFSJ Br. at 25-28.

a.    Causal Connection

First, SleepMed argues that Valenti cannot establish a causal connection because the protected activity occurred too far in advance of the adverse employment action.  Citing to cases which indicate that, in the Second Circuit, "the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation," SleepMed argues that Valenti cannot establish any protected activity temporally proximate enough to establish causation.  See id. at 25-26 (citing Murry v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007).  A review of the relevant dates is useful.  On August 22, 2014, Valenti informed

SleepMed that she intended to file a complaint with the EEOC. <u>See</u> Ex. 33 to Dep. of Valenti (Doc. No. 24-9 at 17). On October 1, 2014, Valenti filed a complaint with the EEOC. <u>See</u> L.R. 56(a)1 Stmt. at ¶ 35. On December 1, 2014, SleepMed terminated Valenti's employment. <u>See</u> Ex. 58 to Dep. of Valenti (Doc. No. 24-9 at 34-35). Reviewing these dates in the light most favorable to Valenti, there does appear to be temporal proximity between the filing of the EEOC complaint and the termination, as Valenti was terminated exactly two months after she filed her complaint.

The court must next determine whether Valenti can establish the prima facie case of retaliation with regards to the other indicated protected activity, namely "requesting a reasonable accommodation and/or complaining about discrimination." Pl.'s MFSJ Obj. at 24. No other potentially protected act took place within the two to three month period outlined by the cases cited by SleepMed. <u>See</u> Def.'s MFSJ Br. at 25; <u>Garrett v. Garden City Hotel, Inc.</u>, No. 05-cv-0962(JFB) (AKT), 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (collecting cases describing the two month dividing line). Valenti responds by explaining that Rose only got involved with her matter after she copied the CEOs of SleepMed on the email stating her intent to file an EEOC complaint. <u>See</u> Pl.'s MFSJ Br. at 24. She alleges that Rose has no knowledge of the certification requirements for Sleep Techs, what training SleepMed provides to Sleep Techs, and has never visited a Connecticut sleep lab. <u>See</u> <u>id.</u> Valenti infers from Rose's involvement that she can establish a causal connection between her statement of intent to file an EEOC complaint, and her termination. Although the court is not persuaded by

Valenti's argument, it does find sufficient evidence in the record that would support a causal connection between Valenti's activity and her termination.[3]

The court concludes that there is evidence sufficient to create a genuine issue of material fact with regard to the fourth element of Valenti's retaliation claim. See Garcia, 706 F.3d at 127. The record demonstrates that, around August 11, 2014, SleepMed discovered that Valenti was still not greeting patients in the lobby. See L.R. 56(a)1 Stmt. at ¶ 24. Valenti explained that her disability only affected her ability to walk to the front desk and back multiple times, effectively asking to continue using the accommodation granted in 2012. See Exs. 26, 27, 29 to Dep. of Valenti (Doc. No. 24-9 at 13-15) (containing emails between Valenti and Hallinan and describing the early process of determining Valenti's disability). The dispute over whether or not Valenti's disability prevented her from escorting patients from the lobby led to a dispute over what information SleepMed required, finally culminating in her termination. See Ex. 58 to Dep. of Valenti (Doc. No. 24-9 at 34-35) (containing the email chain regarding Valenti's termination and indicating that because Valenti would not provide a completed form and had otherwise been unwilling to escort patients, SleepMed was terminating Valenti's employment). This series of events, when viewed in the light most favorable to Valenti, supports the inference that Valenti was terminated as retaliation for requesting that she

---

[3] Valenti insinuates, without evidence to support it, that Rose got involved because of Valenti's stated intent to file an EEOC complaint. Rose's testimony presents a different picture—he testified that he got involved "because [Valenti] had escalated to sending an email to our president and CEO. And once it gets that level of attention, you know, rather than let it run perhaps its normal channels, I put my work aside and tried to help resolve it." Dep. of Rose (Doc No. 39-5) at 30. Rose's lack of specific knowledge as to the layout of the Connecticut sleep labs and the specific training of Sleep Techs similarly does not give rise to the inference that Valenti was terminated for threatening to file an EEOC complaint. See Pl.'s MFSJ Br. at 24. Rose's involvement is Valenti's only argument besides temporal proximity to support the causal connection between a protected activity and an adverse employment action. This inference is not supported by sufficient evidence.

be allowed to continue not greeting patients in the hotel lobby.  See Gorman-Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 554-55 (2d Cir. 2001) (holding that a period of four months provides temporal proximity . . . sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion."); see also, McGuire v. Warren, No. 05-cv-2632 (DCP) (WCC), 2009 WL 3963941, at *12 (S.D.N.Y. Nov. 18, 2009) (distinguishing Garrett's general two month line where the causal connection was not exclusively based on temporal proximity, but supplemented with evidence in the record).

SleepMed also argues that Valenti's retaliation claim must fail because there was an intervening event.  See Def.'s MFSJ Br. at 26-27 (citing Garrett, 2007 WL 1174891 at * 20).  "In this Circuit, an inference of causation is defeated . . . if there was an intervening causal event that occurred between the protected activity and the allegedly retaliatory discharge."  See Saliga v. Chemtura Corp., No. 12-cv-832(VAB), 2015 WL 5822589, at * 18 (D. Conn. Oct. 1, 2015) (quoting Yarde v Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005)).  SleepMed argues that the back-and-forth exchanges which occurred regarding the ADA Form and Valenti's refusal to submit the third page both constituted intervening events sufficient to defeat an allegation that there was causal connection between any protected activity and any adverse employment action.  See Def.'s MFSJ Br. at 26-27.  This event, however, is not intervening.  Instead, it is an event intertwined with and directly tied to Valenti's disability and her request to her employer to accommodate it.  The court cannot say that a breakdown in communication over how to handle Valenti's disability constitutes an intervening causal event sufficient to necessarily prevent a causal connection from

being drawn between Valenti's protected activity (her request for accommodation) and the adverse employment action taken (her termination). Therefore, granting summary judgment on this count would be inappropriate.

Finally, the court must address SleepMed's argument that Valenti's Complaint was based on a "fabrication[ ] from start to finish." See Def.'s MFSJ Br. at 27 (quoting Gross v. Cineplex Odeon Corp., No. 94-cv-2039, 1996 WL 948796 (S.D.N.Y. July 29, 1996) aff'd 152 F.3d 918 (2d Cir. 1998). Although the court is disturbed by allegations of dishonesty in the parties' communications with each other and the court, and by some inconsistencies in the record, the court cannot say with certainty that the Complaint and the EEOC complaint were both based on fraudulent representations. As discussed more fully below, the court takes these allegations seriously, but does not find that it is beyond genuine dispute that the allegations described in the Complaint are based on fraud.

Taken together, whether Valenti can show the prima facie case of retaliation is a genuine issue of material fact.[4] The court next turns to whether SleepMed can offer a legitimate, non-retaliatory reason for its actions.

b.    Legitimate, Non-Retaliatory Reasons

As discussed above, SleepMed can articulate a legitimate, non-retaliatory reason for Valenti's termination. SleepMed can at least offer sufficient evidence that it decided to let Valenti go because Valenti would not cooperate with their efforts to gather

---

[4] SleepMed also argues in a single paragraph in its Reply that Valenti cannot prove that retaliatory animus was the "but-for" cause of the challenged employment action. See Def.'s MFSJ Reply at 10. This argument is not made in the Defendant's Brief in Support of its Motion for Summary Judgment, nor does it cite to an argument in Valenti's Objection that it is replying to, and therefore is not properly before the court. See L.R. 7(d) ("A reply memorandum must be strictly confined to a discussion of matters raised by, and must contain references to the pages of, the memorandum to which it replies.").

information regarding her disability.  Thus, the court turns to the third prong of the McDonnell Douglas framework, whether there is a genuine issue of material fact as to this legitimate reason being pretextual.

    c. Pretext

  Again, as more thoroughly discussed above, see supra at section IV.A.1.d, there is a genuine issue of material fact regarding SleepMed's proffered legitimate reasons for terminating Valenti's employment.   A reasonable jury could decide, based on the evidence before the court, that SleepMed's reason for taking its adverse employment action was pretextual.  Therefore, SleepMed's Motion for Summary Judgment is denied.

  B. Motion for Sanctions

  Finally, SleepMed also moves for sanctions against Valenti based on alleged false statements made in the Complaint.  See Mem. of Law in Support of Def.'s Mot. for Sanctions Pursuant to Rule 11 (Doc. No. 29-1) ("Def.'s Sanctions Br.").  SleepMed argues that the Complaint was filed "containing the specific allegation that Plaintiff's doctor never competed (sic) the ADA questionnaire," despite SleepMed's belief that Valenti and her counsel had in their possession the completed ADA Form.  See id. at 2. SleepMed contends that Valenti faxed the incomplete version of the ADA Form containing only pages one, two, and four to SleepMed, and finally, prevented her doctor from providing SleepMed with the completed form.  See id. at 3-4.  SleepMed desired the third page of the form, which it believed to be necessary because question six at the bottom of page two had been completed.  See id. at 4.

  It was only during discovery that SleepMed learned of the existence of the completed ADA Form, which included the third page.  See id. at 4-5.  Specifically, SleepMed received the completed ADA Form from Valenti in the course of discovery, as

well as another version of the ADA Form with a crossed out page three. See id. SleepMed also determined that Valenti's counsel had received the completed ADA Form approximately six months prior to filing the Complaint. See id. at 5. SleepMed contends that the existence of a completed third page renders the Complaint false, and therefore moves for sanctions. See id. at 5 (citing Compl. at ¶¶ 35-40). SleepMed also points to inconsistencies in Valenti's testimony which it argues further demonstrates her knowledge of the falsity of the allegations in the Complaint. See id. at 6-7. Upon review of the record before the court, it does not find any sanctionable conduct in the Complaint.

Federal Rule of Civil Procedure 11 sets forth the standard of conduct for attorneys presenting pleadings and other written material to the court. See Fed. R. Civ. P. 11. Rule 11(b)(3) requires an attorney offering an argument or pleading based on factual contentions to represent that those contentions "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Fed. R. Civ. P. 11(b)(3). "A pleading, motion or other paper violates Rule 11 either when it 'has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law.'" Kropelnicki v. Siegel, 290 F.3d 118, 131 (2d Cir. 2002) (quoting W.K. Webster & Co. v. Am. President Lines, Ltd., 32 F.3d 665, 670 (2d Cir. 1994)). A Rule 11 violation must be shown to be objectively unreasonable, "and is not based on the subjective beliefs of the person making the statement." Star Mark Management, Inc. v.

<u>Koon Chun Hing Kee Soy & Sauce Factory, Ltd.</u>, 682 F.3d 170, 177 (2d Cir. 2012).

"With regard to factual contentions, sanctions may not be imposed unless a particular allegation is utterly lacking support." <u>Storey v. Cello Holdings, L.L.C.Storey v. Cello Holdings, L.L.C.</u>, 347 F.3d 370, 388 (2d Cir. 2003) (internal citation omitted).

Here, the sum and substance of the Motion for Sanctions is that Valenti, or Valenti's attorney, submitted the Complaint with allegations contained within it that a reasonable attorney would have known to be false. <u>See</u> Def.'s Sanctions Br. at 11-12. The relevant allegations of the Complaint are:

35.   Plaintiff's physician completed a four (4) page questionnaire.

36.   Defendant received the completed questionnaire.

37.   Plaintiff then again asked to return to work.

38.   Defendant told plaintiff that question number 7 of the questionnaire had not been completed by the doctor.

39.   Plaintiff's doctor did not complete question #7 because he answered "no" for question number 5.

40.   As the questionnaire stated, if question #5 is answered "no" then the remainder of the form including question #7 need not be completed.

Compl. at ¶¶ 35-40; <u>See</u> Def.'s Sanctions Br. at 5. The evidence cited by SleepMed does not show that these allegations are "utterly lacking in support." <u>Storey</u>, 347 F.3d at 388. Specifically, it does appear that Valenti's doctor completed the four page ADA Form. <u>See</u> Def.'s Ex. 12 (Doc. No. 27) at 1-4. Additionally, the answer to question five is marked "no," and the form does state, in bold, that, "[i]f the answer to Question 5 is NO, you do not need to complete the remainder of this form." <u>See id.</u> at 2. Further, the

third page of the completed ADA Form does show that question seven was not answered.  See id. at 3.  SleepMed argues that their receipt of a form without the third page was not the "completed" form, but whether the third page needed to be completed and sent to them is a matter in dispute.  See supra at 20-21 (discussing the parties disagreement as to what parts of the ADA Form were necessary).  SleepMed makes no claim for sanctions based Valenti's request to return to work.  Thus, the allegations in the Complaint are not objectively unreasonable.  Therefore, SleepMed's Motion for Sanctions is denied.

## V.     CONCLUSION

Valenti has withdrawn Counts Four and Five, and so her remaining causes of action are her claims of discrimination, failure to accommodate, and retaliation under the ADA.  For the foregoing reasons, SleepMed's Motion for Summary Judgment (Doc. No. 24) is **DENIED**.  SleepMed's Motion for Sanction (Doc. No. 29) is also **DENIED**.

**SO ORDERED**

Dated at New Haven, Connecticut, this 10th day of July, 2017.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge